FILED
United States Court of Appeals
Tenth Circuit

**November 12, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CITIZENS UNITED, a Virginia Non-Stock
Corporation,

     Plaintiff - Appellant,

v.

SCOTT GESSLER, in his official capacity
as Secretary of State of the State of
Colorado; SUZANNE STAIERT, in her
official capacity as Deputy Secretary of
State of the State of Colorado,

     Defendants - Appellees,

and

COLORADO DEMOCRATIC PARTY;
GAROLD A. FORNANDER; LUCIA
GUZMAN; DICKEY LEE
HULLINGHORST,

     Intervenors Defendants.

------------------------------

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON;
COLORADO COMMON CAUSE;
COLORADO ETHICS WATCH;
PROGRESSIVE UNITED,

     Movants.

No. 14-1387
(D.C. No. 1:14-CV-02266-RBJ)

_____

**ORDER**
_____

Before **HARTZ**, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.
_____

On October 27, 2014, the original Order & Judgment and dissent issued in this matter. We now direct the clerk, *sua sponte*, to reissue our decision as a published opinion. We also note some minor amendments have been made to the majority decision and the dissent, both of which are attached to this order for filing. The new opinion and dissent shall be shown filed as of the date of this order.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

November 12, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CITIZENS UNITED, a Virginia Non-Stock corporation,

      Plaintiff - Appellant,

v.

SCOTT GESSLER, in his official capacity as Secretary of State of the State of Colorado; SUZANNE STAIERT, in her official capacity as Deputy Secretary of State of the State of Colorado,

      Defendants - Appellees,
and

COLORADO DEMOCRATIC PARTY; GAROLD A. FORNANDER; LUCIA GUZMAN; DICKEY LEE HULLINGHORST,

      Intervenors Defendants.

---

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON; COLORADO COMMON CAUSE; COLORADO ETHICS WATCH; PROGRESSIVE UNITED,

No.  14-1387

Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:14-CV-02266-RBJ)**

Theodore B. Olson, Gibson, Dunn & Crutcher LLP, (Matthew D. McGill, Amir C. Tayrani, Lucas C. Townsend, Gibson, Dunn & Crutcher LLP, and Michael Boos, Citizens United, with him on the brief), Washington, D.C., for Plaintiff - Appellant.

Matthew D. Grove, Assistant Solicitor General, (Daniel D. Domenico, Solicitor General; Leeann Morrill, First Assistant Attorney General; Kathryn A. Starnella, Assistant Attorney General; with him on the brief), Public Official Unit, State Services Section, Denver, Colorado, for Defendants - Appellees.

Martha M. Tierney and Edward T. Ramey, Heizer Paul LLP, Denver, Colorado, filed an Intervenor-Defendants' Brief for Colorado Democratic Party, Garold A. Fornander, Lucía Guzmán, and Dickey Lee Hullinghorst.

David R. Fine and Lino S. Lipinsky de Orlov, McKenna Long & Aldridge LLP, Denver, Colorado; Luis A. Toro and Margaret G. Perl, Colorado Ethics Watch, Denver, Colorado, filed an amicus curiae brief for Citizens for Responsibility and Ethics in Washington, Colorado Common Cause, Colorado Ethics Watch, and Progressive United.

Before **HARTZ**, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.

**HARTZ,** Circuit Judge.

Citizens United is a nonprofit corporation that has made a name for itself through independent political activity. As noted by the district court, "its principal purpose is to promote social welfare through informing and educating the public on conservative ideas and positions on issues, including national defense, the free enterprise system, belief in

2

God, and the family as the basic unit of society." J. App. at 155 (internal quotation marks omitted). Since 2004 it has produced and released 24 films on various political and religious topics. Films are produced by Citizens United's in-house unit, Citizens United Productions, and occasionally through affiliated entities. They are distributed through theatrical release, DVDs, television, and online digital streaming and downloading. Citizens United sells its films as DVDs for retail and wholesale bulk purchase; arranges for film showings at movie theaters in exchange for a portion of box-office sales; and licenses its films to television broadcasters and digital-streaming companies in exchange for fees or royalties. In a few instances Citizens United has provided free DVDs inserted in newspapers and allowed its films to be screened free of charge to educational institutions and select members of the public and news media. It generally advertises its films on television, in newspapers, on billboards, by electronic and regular mail, and on the Internet.

Citizens United recently completed production of a film titled *Rocky Mountain Heist* on the alleged impact of various advocacy groups on Colorado government and public policy. The film is scheduled to be marketed and distributed in Colorado and throughout the United States beginning this month. It is approximately 30 minutes in length. The budget for production and marketing is $773,975. Like other films produced by Citizens United, *Rocky Mountain Heist* will be distributed through DVD, television broadcast, and online digital streaming and downloading, and it will be advertised on television, radio, and the Internet. Because the film and some of its advertising will

3

unambiguously refer to elected Colorado officials running for office in this year's general election and include footage of events where participants advocate the election or defeat of Colorado candidates, *Rocky Mountain Heist* comes under provisions of Colorado's campaign-practices laws that require certain disclosures with respect to what are termed "electioneering communications" and "independent expenditures."

Citizens United brought the present action against the Colorado Secretary of State (the Secretary) in the United States District Court for the District of Colorado to challenge under the First Amendment the disclosure provisions both on their face and as applied to Citizens United because it is treated differently from various media that are exempted from the provisions (the exempted media). It sought a preliminary injunction against enforcing the provisions that do not apply to exempted media. The district court denied relief, and Citizens United appeals.[1]

Although we agree with much of what the district court said, we must reverse. We do not address the facial challenge to the disclosure provisions, because we afford Citizens United the relief it requested through its as-applied challenge. We hold that on the record before us Citizens United would likely prevail on the merits and therefore is

[1] Citizens United filed its appeal on September 23, 2014. We ordered the parties to file simultaneous briefs on October 3; also permitted a brief by the Intervenors Defendants Colorado Democratic Party, Garold A. Fornander, Lucía Guzmán, and Dickey Lee Hullinghorst; and now grant the motion by Citizens for Responsibility and Ethics in Washington, Colorado Common Cause, Colorado Ethics Watch, and Progressive United to participate as amici curiae. We held oral argument on October 7 and issued an interim order on October 14. This opinion explains the basis of that order and does not consider events occurring after October 14.

entitled to a preliminary injunction. In light of (1) the Colorado disclosure exemptions for printed periodicals, cable and over-the-air broadcasters, and Internet periodicals and blogs, (2) the rationale presented for these exemptions, and (3) Citizen United's history of producing and distributing two dozen documentary films over the course of a decade, the Secretary has not shown a substantial relation between a sufficiently important governmental interest and the disclosure requirements that follow from treating *Rocky Mountain Heist* as an "electioneering communication" or treating the costs of producing and distributing the film as an "expenditure" under Colorado's campaign laws. Citizens United has also sought to have its advertising for *Rocky Mountain Heist* exempted from the disclosure provisions. But it has not demonstrated that the Secretary would exempt advertising placed by the exempted media if the advertisements mentioned a candidate or advocated for the election or defeat of a candidate. Having failed to show that in this respect it would be treated differently from the exempted media, Citizens United is not entitled to relief regarding advertising. To explain our holding, we begin by describing the pertinent disclosure provisions of Colorado law.

I.      COLORADO DISCLOSURE PROVISIONS

Under the Colorado Constitution and the state's Fair Campaign Practices Act (FCPA), speakers who engage in "electioneering communications" and "independent expenditures" are subject to various reporting and disclosure requirements. *See* J. App. at 156. Electioneering communications are statements about candidates made shortly

5

before an election.  Article XXVIII of the Colorado Constitution and the FCPA define

*electioneering communication* as:

> any communication broadcasted by television or radio, printed in a
> newspaper or on a billboard, directly mailed or delivered by hand to
> personal residences or otherwise distributed that:
> (I) Unambiguously refers to any candidate; and
> (II) Is broadcasted, printed, mailed, delivered, or distributed within
> thirty days before a primary election or sixty days before a general
> election; and
> (III) Is broadcasted to, printed in a newspaper distributed to, mailed
> to, delivered by hand to, or otherwise distributed to an audience that
> includes members of the electorate for such public office.

Colo. Const. art. XXVIII, § 2(7)(a); *see* Colo. Rev. Stat. § 1-45-103(9) (2011).

Expenditures include money spent to endorse or oppose a candidate.  An *expenditure* is:

> any purchase, payment, distribution, loan, advance, deposit, or gift of
> money by any person for the purpose of expressly advocating the election
> or defeat of a candidate or supporting or opposing a ballot issue or ballot
> question. An expenditure is made when the actual spending occurs or when
> there is a contractual agreement requiring such spending and the amount is
> determined.

Colo. Const. art. XXVIII, § 2(8)(a); *see* Colo. Rev. Stat. § 1-45-103(10).  Article XXVIII

and the FCPA define *independent expenditure* as "an expenditure that is not controlled by

or coordinated with any candidate or agent of such candidate."  Colo. Const. art. XXVIII,

§ 2(9); *see* Colo. Rev. Stat. § 1-45-103(11).  When Colorado election law uses the term

*candidate*, it is referring only to candidates for office in Colorado.  *See* Colo. Const. art.

XXVIII, § 2(2).

Under § 6 of Article XXVIII, any person (natural or artificial) expending $1000 or

more per calendar year on electioneering communications must submit reports to the

Secretary including the amounts spent on the electioneering communication; the name of the candidate referenced in the communication; and the name, address, occupation, and employer of anyone donating more than $250 per year to the person for the communication. *See id.* § 6(1); 8 Colo. Code Regs. § 1505-6:11.5 (2012). Reports are due biweekly in the two months before the general election, with a final report due 30 days after the election. *See* Colo. Rev. Stat. § 1-45-108(2)(a)(I)(D)–(E) (2012).

At oral argument the Secretary (through counsel) informed this court about oversight of the disclosure requirements. First, he does not require disclosure of the amount spent to produce an electioneering communication because there is no communicative aspect to production. For example, even if *Rocky Mountain Heist* is an electioneering communication, the regulations governing electioneering communications would not require Citizens United to report the cost of producing it or the identities of those who donated to the production. Also, a donor must be disclosed only if the donation was earmarked for an electioneering communication. *See* Colo. Code Regs. 1505-6:11-1. The Secretary emphasized the precision with which the earmarking must be made. If a donor permits the recipient to use the donation for electioneering communications and other purposes, and the entire donation could be used for the other purposes, the donor need not be disclosed. Thus, if a donor told Citizens United that the donation could be used for producing *Rocky Mountain Heist* or covering office overhead, Citizens United would not be required to disclose the donor because all the money could be used for purchasing office paper.

The disclosure requirements for independent expenditures are a bit different. Section 5 of Article XXVIII provides that any person making an independent expenditure in excess of $1000 per calendar year must file a notice with the Secretary providing a detailed description of the use of the independent expenditure, specifying the amount of the expenditure, and naming the candidate whom the expenditure is intended to support or oppose. *See* Colo. Const. art. XXVIII, § 5(1). The definition of expenditure, not surprisingly, focuses on expenditures (unlike the definition of electioneering communication, which focuses on the communication itself); so if *Rocky Mountain Heist* attacks or supports a candidate, the cost of producing the film must be disclosed. Any person making an independent expenditure or accepting a donation for the purpose of making an independent expenditure in excess of $1000 per year must create an independent expenditure committee, register with the Secretary, and, if the person is a corporation, report details of its corporate form and ownership structure within two business days of the date on which the expenditure reaches or exceeds $1000. *See* Colo. Rev. Stat. § 1-45-107.5(3)–(4) (2010); 8 Colo. Code Regs. 1505-6:5.2. The person must also maintain a separate bank account and use it exclusively for receiving donations for and making independent expenditures. *See* Colo. Rev. Stat. § 1-45-107.5(7).

Any person making independent expenditures of more than $1000 per year must report to the Secretary the amounts spent and the name, address, occupation, and employer of any person who donated more than $250 "for the purpose of making an independent expenditure." *Id.* § 1-45-107.5(4)(b). And any person making an

8

independent expenditure in excess of $1000 is required to disclose any donation in excess of $20 given during the reporting period for the purpose of making an independent expenditure. *See id.* § 1-45-107.5(8). Independent expenditures have the same filing schedule as electioneering communications, except that expenditures in excess of $1000 made within 30 days of a primary or general election must be reported within 48 hours after obligating money for the independent expenditure. *See id.* § 1-45-107.5(4)(c). Any communication that constitutes an independent expenditure must prominently identify the person making the expenditure. *See* Colo. Const. art. XXVIII, § 5(2); Colo. Rev. Stat. § 1-45-107.5(5)(a). As in the electioneering-communication context, the Secretary requires the disclosure of an independent-expenditure donor only when the donor has specifically earmarked the money for independent expenditures. Thus, if *Rocky Mountain Heist* attacks or supports Colorado candidates, the production costs of the film must be disclosed, but a donation must be disclosed only if it was directed to be used solely to attack or support Colorado candidates. Money donated to Citizens United for general use need not be disclosed, nor would Citizens United be required to report a donation to be used, at Citizen United's discretion, for films attacking or supporting candidates in states including (but not limited to) Colorado.

Although the Secretary is responsible for promulgating and enforcing rules in furtherance of these reporting and disclosure provisions, *see* Colo. Const. art. XXVIII, §§ 8–9; Colo. Rev. Stat. § 1-45-111.5, others can also pursue enforcement. Any person who believes that there has been a violation of the law may file a written complaint with

9

the Secretary, who refers the complaint to an administrative law judge for a hearing. *See* Colo. Const. art. XXVIII, § 9(2)(a). If the administrative law judge finds a violation and the Secretary does not file an enforcement action within 30 days of the decision, the person who filed the complaint may bring a private cause of action in state district court. *See id.* Any person who violates the disclosure provisions will be fined $50 per day for each day the information is not filed as required. *See id.* § 10(2)(a); *see also* Colo. Rev. Stat. § 1-45-111.5(c). Any person who fails to file three or more successive reports concerning contributions, expenditures, or donations is subject to a civil penalty of up to $500 for each day the reports are not filed. *See* Colo. Rev. Stat. § 1-45-111.5(c). The penalty can be doubled if the failure is intentional. *See id.*

Critically important to this litigation are the exemptions to the above disclosure provisions. Excluded from the definition of *expenditure* are:

> (I) Any news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party;
> (II) Any editorial endorsements or opinions aired by a broadcast facility not owned or controlled by a candidate or political party;
> (III) Spending by persons, other than political parties, political committees and small donor committees, in the regular course and scope of their business or payments by a membership organization for any communication solely to members and their families;
> (IV) Any transfer by a membership organization of a portion of a member's dues to a small donor committee or political committee sponsored by such membership organization; or payments made by a corporation or labor organization for the costs of establishing, administering, or soliciting funds from its own employees or members for a political committee or small donor committee.

10

Colo. Const. art. XXVIII, § 2(8)(b); *see* Colo. Rev. Stat. § 1-45-103(10). There are also four exclusions from the definition of *electioneering communication*, the first three of which are essentially the same as for expenditures.[2]

The Secretary has broadly interpreted the first two exemptions, which concern material printed in periodicals and aired by a broadcast facility. He informed this court at oral argument that he applies the exclusions to online editions of print newspapers, online-only newspapers, all broadcasts, cable shows, and even blogs, regardless of their partisan nature. The Secretary acknowledged that there may be questions at the margins regarding whether, say, a blog is a periodical, but he referred to court decisions as guides in making that determination. He cited two cases as examples. In *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 250 (1986) (*MCFL*), the Supreme Court held that the press exemption under federal law did not apply to a group's one-time "Special Edition" newsletter based on factors distinguishing it from its regular publication, such as the use of different publishing staff, the distribution to a group 20 times the size of the usual audience, and the absence of the usual masthead and

---

[2] The term *electioneering communication* does not include "(I) Any news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party; (II) Any editorial endorsements or opinions aired by a broadcast facility not owned or controlled by a candidate or political party; (III) Any communication by persons made in the regular course and scope of their business or any communication made by a membership organization solely to members of such organization and their families; (IV) Any communication that refers to any candidate only as part of the popular name of a bill or statute." Colo. Const. art. XXVIII, § 2(7)(b); *see* Colo. Rev. Stat. § 1-45-103(9).

volume and issue numbers. In *Bailey v. Maine Commission on Governmental Ethics &*
*Election Practices*, 900 F. Supp. 2d 75, 91 (D. Me. 2012), the court considered a website
called "the Cutler Files," which advocated the defeat of gubernatorial candidate Eliot
Cutler. The operator of the website was a paid consultant for an opposing candidate. *See*
*id.* at 90. The website was updated six times between August 30 and September 29,
2010, but was taken down after two months. *See id.* The court rejected the website
operator's equal-protection challenge to the state's refusal to apply to him the disclosure
exemption for periodical publications. *See id.* at 91.

The exemptions do not encompass all possible campaign-related activity by the
exempted media. For example, the Secretary's brief in this court states that if a news
organization "were to engage in such fundraising and solicitation efforts [to raise money
for the organization's pieces], . . . such communications would not qualify as press," and
cites cases saying that not all uses of the press entity's resources would be exempt.
Aplee. Br. at 40; *see also* Aplee. Br. at 22 (indicating that *The Denver Post* would not be
able to rely on the exemption if it produced a documentary advocating for a candidate
that was funded by solicited contributions). Of special interest in this case, the language
exempting "news articles, editorial endorsements, opinion or commentary writings, or
letters to the editor," Colo. Const. art. XXVIII, § 2(8)(b), 7(b), does not on its face
include an advertisement placed by a media entity on a television or radio broadcast to
increase the number of its readers or viewers. Thus, if the advertisement mentions a
candidate or expressly advocates the election or defeat of a candidate, it may have to be

treated as an electioneering communication or independent expenditure. We do not

understand anything the Secretary has told the court as indicating that such an ad would

be exempt from the disclosure requirements.

## II.     THE PRESENT CONTROVERSY

In April 2014, Citizens United filed a Petition for a Declaratory Order with the

Secretary requesting a ruling stating that *Rocky Mountain Heist* and related marketing

activities would not qualify as "electioneering communications" or "expenditures" under

Colorado law. In support of its request, it pointed out that the Federal Election

Commission (FEC) had granted it an exemption from the disclosure provisions of the

Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30101 et seq. (the

federal statute) in an advisory opinion (the Advisory Opinion) issued on June 11, 2010.

Under the federal statute the definitions of *electioneering communication*[3] and

*expenditure*[4] are similar to Colorado's definitions. And the statutory exclusions from the

---

[3] "The term 'electioneering communication' means any broadcast, cable, or satellite communication which refers to a clearly identified candidate for Federal office; is made within 60 days before a general, special, or runoff election for the office sought by the candidate; or 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3)(A) (paragraph formatting omitted).

[4] "The term 'expenditure' includes any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and a written contract, promise, or agreement to make an expenditure." 52 U.S.C. § 30101(9)(A) (paragraph formatting omitted).

Continued . . .

13

definition, which the FEC refers to as the "press exemption," J. App. at 30 (FEC Advisory Opinion 2010-08 (June 11, 2010)), are also similar.[5] The FEC construes the press exemption to cover a "legitimate press function" conducted by a "press or media entity." *Id.* at 31–32. The Advisory Opinion determined that Citizens United is a press entity and that distribution and production of its films are legitimate press functions. Noting that the FEC had read the press exemption "to cover cable television, the Internet, satellite broadcasts, and rallies staged and broadcast by a radio talk show," it said that "[i]n fact, the Commission has not limited the press exemption to traditional news outlets, but rather has applied it to news stories, commentaries, and editorials *no matter in what medium they are published*." *Id.* at 31 (brackets and internal quotation marks omitted). To determine whether an entity is a press entity, the FEC "has focused on whether the entity in question produces on a regular basis a program that disseminates news stories, commentary and/or editorials," and it has "interpret[ed] 'news story, commentary, or editorial' to include documentaries and educational programming." *Id.* at 32. It

---

[5] "The term 'electioneering communication' does not include a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate." 52 U.S.C. § 30104(f)(3)(B) (paragraph formatting omitted). An FEC regulation construes the term *broadcasting station* to include "any broadcast, cable, or satellite television or radio station." *See* 11 C.F.R. § 100.29(c)(2).

The term *expenditure* does not include "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee or candidate." 52 U.S.C. § 30101(9)(B)(i).

14

concluded that Citizens United's costs of producing and distributing its films are entitled to the press exemption.[6]

Refusing to follow the FEC's lead, the Secretary's Declaratory Order denied Citizens United's request for an exemption. *See* J. App. at 37, 44–45 (Declaratory Order, In the Matter of Citizens United's Pet. for Declaratory Order, Office of the Sec'y of State, State of Colo. (June 5, 2014)). It ruled that the film and its advertising did not fall within Colorado's exemption for print media and that Citizens United is not a broadcast facility. It also ruled that the exemption for communications made in the regular course and scope of a business was inapplicable. Relying on the decision by the Colorado Court of Appeals in *Colorado Citizens for Ethics in Government v. Committee for the American Dream*, 187 P.3d 1207 (Colo. Ct. App. 2008), the Order stated that the regular-business exemption applies only to persons whose business is primarily to distribute content as a service. Finally, it stated that it could not adopt the FEC's reasoning for exempting Citizens United's films because the Colorado Secretary of State lacks the authority to read a general "press exemption" into the plain language of Colorado law. Accordingly, the Order concluded that *Rocky Mountain Heist* would be an electioneering

---

[6] The FEC also decided that Citizens United's advertisements for its films are exempt. *See* J. App. at 34 (FEC Advisory Opinion). The FEC noted that "courts have held that where the underlying product is covered by the press exemption, so are advertisements to promote that underlying product." *Id.* (citing *Fed. Election Comm'n v. Phillips Pub., Inc.*, 517 F. Supp. 1308, 1313 (D.D.C. 1981) and *Reader's Digest Ass'n, Inc. v. Fed. Election Comm'n*, 509 F. Supp. 1210, 1215 (S.D.N.Y. 1981)).

15

communication not within any exemption. It did not determine whether the film would constitute an independent expenditure (supporting or attacking a candidate) because it was unclear whether the film would contain "express advocacy," as required by art. XXVIII, § 2(8)(a).

Citizens United did not seek review of the Declaratory Order in Colorado court. Instead, it filed suit in federal court, alleging that Colorado's reporting and disclosure requirements violate the First Amendment to the United States Constitution and Article II, §10 of the Colorado Constitution. Simultaneously, Citizens United filed a motion for a preliminary injunction prohibiting the Secretary from enforcing Colorado's reporting and disclosure requirements against Citizens United and all other Colorado speakers. The district court denied Citizens United's motion for a preliminary injunction after determining that Citizens United's facial and as-applied challenges did not have a substantial likelihood of success on the merits. We have jurisdiction under 28 U.S.C. § 1292(a) to consider Citizens United's appeal of that denial. Citizens United no longer relies on Article II, §10 of the Colorado Constitution.

III.    ANALYSIS

Citizen United's complaint in federal court attacks the Colorado disclosure exemptions for print and broadcast media. It argues that because the exemptions discriminate among speakers on the basis of identity, the Colorado constitutional and statutory disclosure provisions are facially invalid under the First Amendment and must be voided. In the alternative, it argues that those provisions are unconstitutional as

16

applied to Citizens United and it must be provided the same exemptions as the print and broadcast media.

## A. Preliminary-Injunction Standard

In determining whether to grant a preliminary injunction, a court must weigh (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the relative weight of the harm alleged by the movant and the harm to the nonmoving party; and (4) the public interest. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). Weighing ordinarily must be performed by the district court in the first instance, and our review of a denial of a preliminary injunction is for abuse of discretion. *See id.* Under this standard of review, "we examine the district court's legal determinations de novo, and its underlying factual findings for clear error," *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009), and "[a] district court abuses its discretion by denying a preliminary injunction based on an error of law," *Hobby Lobby*, 723 F.3d at 1128. We begin (and, in essence, end) our review by analyzing Citizens United's likelihood of success on the merits.

## B. Likelihood of Success on the Merits

We agree with Citizens United's as-applied challenge to Colorado's campaign-disclosure requirements. On the record before us, we hold that the First Amendment requires the Secretary to treat Citizens United the same as the exempted media. We need not address Citizen United's facial challenge, which would provide *all* speakers with the

17

same exemptions provided to the exempt media, because a ruling of facial invalidity would not grant Citizens United any additional relief. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) ("[A]lthough the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." (citation omitted)).

In assessing the constitutionality of Colorado's disclosure requirements, we consider whether they satisfy exacting scrutiny. This is the standard generally applied to such requirements. *See, e.g.*, *Doe v. Reed*, 561 U.S. 186, 196 (2010) ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'"); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010) ("The Court has subjected [disclaimer and disclosure] requirements to exacting scrutiny" (internal quotation marks omitted)); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (governmental interest in disclosure requirements "must survive exacting scrutiny" (internal quotation marks omitted)); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("Since *NAACP v. Alabama* [357 U.S. 449 (1958),] we have required that the subordinating interests of the State [in compelled disclosure] survive exacting scrutiny."); *Sampson v. Buescher*, 625 F.3d 1247, 1254–61 (10th Cir. 2010) (under exacting-scrutiny review, Colorado disclosure requirements were unconstitutional as applied to a neighborhood organization opposing ballot measure to annex the

18

neighborhood to adjacent town).  For the law to pass muster there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest."  *Citizens United*, 558 U.S. at 366–67 (internal quotation marks omitted).  "That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  *Reed*, 561 U.S. at 196 (internal quotation marks omitted).  Although Citizens United contends that we should apply the more stringent standard of strict scrutiny because Colorado law discriminates against speech based on the identity of the speaker, we need not address this contention because Citizens United's challenge prevails under the exacting-scrutiny standard.

Our analysis proceeds as follows:  First, we discuss the purpose of disclosures relating to electioneering communications and independent expenditures (those not coordinated with a candidate).  We agree with the Secretary that they serve the purpose of providing the electorate with information about the source of election-related spending.  In light of the Supreme Court's analysis in *Citizens United*, however, we do not agree that they play a role in deterring or exposing campaign corruption.  Next, we address the justifications for the media exemptions under Colorado law.  We reject the Secretary's contention that the media exemptions can be justified on the ground that the First Amendment provides greater protection for the press than other speakers.  The Supreme Court rejected that proposition in *Citizens United*.  And we reject the suggestion in the Secretary's brief that the exemption is justified by the professionalism and objectivity of the press.  But we accept the Secretary's contention that the exemptions are justified on

the ground that familiarity with the media sufficiently enables the electorate to evaluate reports and opinions in the media. This justification, however, amounts to saying that Colorado has no sufficiently important governmental interest in disclosure by the exempted media because the electorate can adequately evaluate their articles and opinions anyway. That being the case, Colorado likewise has no sufficiently important governmental interest in requiring those same disclosures by Citizens United, which— through its history of producing films—can just as easily be evaluated by the electorate.

### 1. Governmental Interests in Disclosure

The Secretary's brief states: "Colorado's disclosure laws are narrowly tailored to serve two compelling government interests—ensuring that Colorado's electors are able to discern who is attempting to influence their votes, and discouraging corruption by making large independent expenditures a matter of public record." Aplee. Br. at 16. We agree in part. In *Citizens United* the Supreme Court recognized that disclosures related to independent expenditures can "help citizens make informed choices in the political marketplace." 558 U.S. at 368 (internal quotation marks omitted); *see also First Nat'l Bank of Bos. v. Bellotti,* 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected."). Colorado can rely on this informational interest for its disclosure scheme.

We reject, however, the Secretary's assertion of an anticorruption rationale for reporting independent expenditures. The Secretary cites Supreme Court authority for the

20

proposition, such as *McCutcheon v. Federal Election Commission*, 134 S. Ct. 1434, 1459 (2014) (disclosure requirements may "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity"), and *Buckley*, 424 U.S. at 67 ("[D]isclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election." (footnote omitted)). But those statements were made in the course of consideration of disclosure requirements that applied to much more than just independent expenditures—in particular, disclosure of direct contributions to candidates. The Court's present doctrine sharply distinguishes contributions to candidates or expenditures coordinated with candidates from independent expenditures free of any such coordination. It recognizes that expenditures and contributions that are not independent present a risk of quid pro quo corruption. *See Citizens United*, 310 U.S. at 356–57. But the Court has emphatically stated that independent expenditures are not tied to corruption: "[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Id.* at 357. "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.* (internal quotation marks omitted). The Court noted that the voluminous

21

record in *McConnell v. Federal Election Commission*, 251 F. Supp. 2d 176, 209 (D.D.C. 2003), *aff'd in part, rev'd in part*, 540 U.S. 93 (2003), did not contain any examples of votes by elected officials being exchanged for expenditures. *See Citizens United*, 558 U.S. at 360. In light of what the Supreme Court has said, the Secretary must explain (and support with evidence) how disclosures of independent expenditures would help deter or disclose the quid pro quo corruption of concern to the Court. This he has failed to do.

### 2. Justification for Media Exemptions

Given the governmental interest in disclosure, why are the media exempted, at least in part?

Since the justification for the exemptions concerns the specifics of the Colorado disclosure laws, not press exemptions in the abstract, a brief review of the disclosure requirements and exemptions is useful. First, the disclosure requirements are not expansive. Although electioneering communications (statements that mention Colorado candidates) and expenditures (to support or oppose Colorado candidates) must be reported, the requirements to disclose the financial backers of organizations (such as corporations) that make electioneering communications or independent expenditures are limited. Donors to the general funding of the organization need not be disclosed. The only donors who must be disclosed (by name and occupation) are those who earmark contributions for the specific, *exclusive* purpose of electioneering communications or expenditures regarding Colorado candidates.

22

As for the media exemptions, no reporting is required for any news or opinion piece (not including advertising) appearing in a printed periodical. The exemption extends to letters to the editor and op-eds, regardless of whether the letters or op-eds have been instigated or funded by an organization. And the "printed" press includes online newspapers and blogs, regardless of the ideological bias of the newspaper or blog. Opinions (again, other than advertisements) aired by a broadcast facility (including cable) are also exempt. Although news reports by broadcast media are not explicitly exempted, the Secretary apparently treats them the same as news reports in the print media.

So how does the Secretary explain the media exemptions? Two of the Secretary's proffered justifications can be disposed of summarily. First, the Secretary says that "'a valid distinction exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public.'" Aplee. Br. at 41 (brackets omitted) (quoting *McConnell*, 540 U.S. at 208, which was overruled by *Citizens United* on that point). That reason, at least as a constitutional proposition, can no longer stand after *Citizens United*. The Supreme Court wrote: "There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. *We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers.*" *Citizens United*, 558 U.S. at 352 (emphasis added, internal quotation marks omitted). This is not to say that a statute can never properly distinguish the news media from other speakers. But that distinction has no

23

basis in the First Amendment and cannot immunize differential treatment from a First Amendment challenge; a difference in treatment would have to be defended on other grounds.

Second, the Secretary's brief contends that "whereas journalism seeks to inform or educate the public and expose ideas at regular intervals in a transparent, balanced, and accountable manner, drop-in political advertisements appeal to the emotions of viewers or readers with the goal of pure persuasion." Aplee. Br. at 38. One can hope that transparency, balance, and accountability are ideals of "journalism" as a profession. But it is a highly questionable proposition that newspapers and broadcast stations (to say nothing of blogs) are uniformly transparent, balanced, and accountable. Our nation's founding and history are replete with examples of highly partisan newspapers, and many observers would say that some modern media continue the tradition. In any event, the Secretary in effect abandoned this contention at oral argument, stating that partisanship is not a factor in determining whether the Colorado media exemptions apply. Speaking of blogs, he said: "[I]t doesn't matter whether they take an ideological point of view. The whole blog could be devoted and many are to promoting the Republicans, promoting the Democrats, the Green Party, the Libertarians, whoever. That's not the issue. It's not the viewpoint or the content that makes a difference." Oral Arg. 23:02–23:17. The abandonment of the "transparent, balanced, and accountable" contention was well-advised. *Cf. San Juan Cnty. v. No New Gas Tax*, 157 P.3d 831, 841 (Wash. 2007) ("We

24

agree with the Federal Election Commission that for the media exemption to apply, the publication need not be fair, balanced, or avoid express advocacy or solicitations.").

The third justification, expressed in a variety of ways in the Secretary's brief, is that the electorate can properly assess a statement by the exempted media because of its familiarity with the source. The brief states:

> [T]he exemption of some communications and the inclusion of others represents a policy choice not about the viewpoints expressed in those communications, but about the heuristic cues that a viewer or reader may be able to glean from the medium of expression. Simply put, in adopting Amendment 27 [to the Colorado Constitution], Colorado's citizens determined that voters should be armed with the ability to find out who is attempting to influence their votes. Communications that qualify for the press exemption are not included because such information is often easily discernible from the communication itself.

Aplee. Br. at 22. Later the brief makes the same point: "[T]he line drawn by Colorado's press exemption centers on an audience member's ability to evaluate the credibility of a particular message to determine the weight that it should be given." *Id*. at 38. The brief distinguishes the media from single-shot speakers who have no track record and can use a misleading name (say, Voters for a Better World) to make assessment of their purposes difficult, if not impossible. In contrast to communications by the exempted media, asserts the brief, "isolated instances of anonymous express advocacy leave voters adrift, without the context necessary to appropriately evaluate the message." *Id.* at 34. The point is repeated several times later in the brief:

> [U]nlike advocacy groups such as Citizens United—which often engage in drop-in advocacy like a standalone film, a single election mailer, or an anonymous website[—]organizations engaging in traditional press

25

functions publish at regular intervals, which, in turn, provide electors with a context for evaluating any given message.

*Id.* at 40.

Unlike political advocacy groups, whose names often do not provide any useful cue or meaningful information to help a voter evaluate . . . that message, communications that qualify for the press exemption generally provide viewers with various means for determining who is speaking and, therefore, what weight to give the message.

*Id.* at 42 (brackets, citations, and internal quotation marks omitted).

[A]udiences can assess the accuracy of a newspaper's reporting by looking at its practices over time, or determine what weight to give its articles by reviewing its masthead or a blog's list of reporters. In contrast, drop-in political advocacy, like *Rocky Mountain Heist*, does not afford audiences the same ability to assess the message's reliability or determine what weight to give it.

*Id.* at 42–43 (citations omitted). The brief sums up:

[T]he exemptions at issue in this case, which apply to both independent expenditures and electioneering communications, are appropriately designed to require disclosure only where a voter's ability to satisfy the informational interest is most lacking. Each category of exempted communication, by virtue of its medium, permits viewers or readers to assess and evaluate the messaging more easily than a transient communication like *Rocky Mountain Heist*. Viewers can evaluate the messaging in written periodicals by looking to the publication's masthead, list of reporters, the angle of news reporting over a period of time, and practice of publishing at regular intervals. Many of the same factors would apply to editorial endorsements or opinions aired by a broadcast facility.

*Id.* at 45–46 (citations omitted).[7]

---

[7] In supporting the proposition that "the line drawn by Colorado's press exemption centers on an audience member's ability to evaluate the credibility of a particular message," Aplee. Br. at 38, the Secretary's brief includes the following paragraph: "Second, in contrast to advocacy groups who often engage in specific fundraising appeals

Continued . . .

in order to engage in a particular initiative or to champion a particular political message, traditional news organizations typically do not engage in fundraising initiatives for express advocacy pieces or solicit money from subscribers who wish to earmark their funds for a specific message. And, even if they were to engage in such fundraising and solicitation efforts, . . . such communications would not qualify as press." Aplee. Br. at 39–40 (citations omitted). We are not sure what to make of this. The brief does not tie the paragraph to the ability of a reader to evaluate the message. Perhaps the paragraph is only expressing the proposition that certain types of communications—such as solicitations for money to fund a specific message by the entity—are not traditional press functions and would not be exempt from disclosure requirements even if engaged in by an exempted media entity. This proposition is suggested by the three case citations supporting the second sentence. *See id.* at 40 ("*see also McConnell v. FEC*, 540 U.S. 93, 208 (2003) (press exemption 'does not afford carte blanche to media companies generally to ignore [the federal campaign statute's] provisions'); *Readers Digest*, 509 F. Supp. at 1214 (rejecting assertion that the press exemption would 'exempt any dissemination or distribution using the press entity's personnel or equipment, no matter how unrelated to its press function'); *San Juan County v. No New Gas Tax*, 157 P.3d 831, 841 (Wash. 2007) ([stating that '[t]he distinction between "political advertising" and "commentary" may be relevant in deciding whether a media entity is performing a legitimate press function [and providing as an illustration, a radio station's giving a campaign free air time for which it usually charges].')"). And the proposition is consistent with the language of the Colorado media exemptions, which limit them to no more than "news articles, editorial endorsements, opinion or commentary writings, or letters to the editor." Colo. Const. art. XXVIII, § 2(7)(b); *see id.* § 2(8)(b). Certainly, solicitations are neither articles nor opinion pieces. Read in this light, the paragraph is not providing a justification for a media exemption, but only for limiting the scope of the exemption granted to the exempted media. Because Citizens United has not presented any argument that it should be treated *more* leniently than other media, we do not concern ourselves with whether these limitations on the exemptions can withstand constitutional scrutiny.

On the other hand, one might be able to read into this cryptic paragraph an argument that the media are granted an exemption because they would have nothing to disclose anyway. If this is the argument intended, it is not adequately presented to preserve the point. Moreover, the argument is flawed. The Secretary cites to no legislative or administrative authority or court decision recognizing this justification for the press exemption, and, more importantly, he provides no evidentiary support for the factual premise. He cites only the following exchange during the testimony of his expert witness at the district-court hearing: "[Counsel for Secretary:] Have you ever heard of an organization like *The Denver Post* or *The New York Times* raising money specifically to put on an ideological—strike that—a film that contains express advocacy for or against

Continued . . .

27

We get the message.  And it has weight.  When a speaker "drops in" on an election and starts talking about candidates and issues, the electorate wants to know who the speaker is to better enable it to evaluate the message.  Knowing who is financing the speaker can be helpful in this regard.  But when the speaker belongs to the media, the electorate has ample means of making the evaluation.  Of course, there may be questions about whether a speaker belongs to the exempted media; but major factors are obviously whether it has spoken sufficiently frequently and meaningfully (not in 30-second sound bites) over an extended period of time—factors that closely correlate with the opportunity of the public to evaluate the speaker.  *See* Aplee. Br. at 40 ("organizations engaging in traditional press functions publish at regular intervals, which, in turn, provide electors with a context for evaluating any given message").  For example, in *Bailey*, which the Secretary endorsed as setting forth how to distinguish a blog that is eligible for the media exemption from one that is not, the court wrote that "[t]his case could well have come out

a candidate?  [Professor Shepard:]  I am not aware of any traditional press organization that would spend this kind of money for a one-time express-advocacy piece in the weeks before an election."  J. App. at 263.  This testimony establishes nothing relevant.  The witness limits himself to "any traditional press organization," which would likely exclude many of the online media that qualify for the Colorado media exemptions.  He discusses only "one-time" pieces, which is an undefined term that may not include repeat players like Citizens United.  And he says nothing about earmarked donations, such as whether blogs receive them or whether repeat-player film makers would have any reportable donations.  Consequently, this one sentence of testimony is too slim a reed on which to rest the no-need-to-disclose argument.  Further, if earmarked donations to the exempted media are rare (and therefore unexpected), one would think that there would be a heightened, rather than a diminished, interest in learning that the unexpected event (a donation) had occurred.

differently if the Cutler Files had any sort of track record before it appeared on August 30, 2010, or if it had extended beyond its two month run." 900 F. Supp. 2d at 91.

At the very least, it is reasonable for Colorado to provide a media exemption on this ground. This ground, however, has an equivalent formulation that is fatal to the Secretary's position in this case. What the Secretary is saying, in essence, is that the exemption is justified because the interest supporting the disclosures required by Colorado law—to give the electorate the means to evaluate a speaker—does not apply to the exempted media's reports and commentary as that interest is adequately satisfied by their history of reporting and offering opinions. And once that proposition is accepted, the Secretary must explain why the interest in those disclosures nevertheless applies to films by Citizens United. In our view, the Secretary has not supplied an adequate explanation. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 474 (1995) ("Congress' decision to provide a total exemption [from a ban on honoraria for speeches and articles by federal employees] for *all* unrelated *series* of speeches undermines application of the ban to *individual* speeches and articles with no nexus to Government employment." (emphasis added)); *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1944) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place.").

The Secretary refers to Citizens United as a "drop-in" advocate, but in the relevant sense of that adjective, it is anything but. In terms of providing the requisite context for

29

its messages, it is similar to exempted blogs and opinion shows on radio and cable television. Citizens United has an extended history of producing substantial work, comparable to magazines or TV special news reports rather than advertisement sound bites. *Rocky Mountain Heist* is its 25th film on political and religious topics over the course of 10 years. This history provides information about Citizens United that is at least as accessible to the public as donor lists reported to the Secretary. The dissent would have us compare Citizens United to *The Denver Post* in evaluating the public's interest in disclosure. But that is not the relevant comparison. The disclosure exemptions are not limited to major Colorado metropolitan newspapers. They cover small weekly papers, quarterly national journals, online newspapers, and blogs originating from anywhere in the world. The Secretary has tried to explain why such entities should be exempted but not Citizens United, and he has failed.[8] The electorate would have far

---

[8] The dissent at pages 5–6 also seems to suggest that there is something unique about films (as a distinct "form of . . . speech") that justifies distinguishing Citizens United from other media. But the Secretary has made no such argument, and we would reject it anyway. We fail to see any material difference between a documentary as a DVD and a documentary broadcast on TV. The Supreme Court has said that the First Amendment does not recognize distinctions among media used to convey political views. *See Citizens United*, 558 U.S. at 326 ("Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker."). And in striking down a state statute restricting sales of violent video games to minors, the Court noted the absence of restrictions on violence in other media. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2736–39; *id.* at 2740 ("Here, California has singled out the purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—and has given no persuasive reason why.").

more cues to evaluate a documentary by Citizens United than an editorial in a weekly newspaper or quarterly magazine that rarely addresses controversial political topics.

Because Colorado has determined that it does not have a sufficient informational interest to impose disclosure burdens on media entities, it does not have a sufficient interest to impose those requirements on Citizens United. There cannot be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," *Citizens United*, 558 U.S. at 366–67 (internal quotation marks omitted), when there is no important governmental interest. In particular, the film *Rocky Mountain Heist* is exempt from treatment as an electioneering communication or an independent expenditure. The costs of its production and distribution, and donations earmarked for those purposes, need not be disclosed.

The dissent suggests that we should not "focus[] on Citizens United and its required disclosure" but rather on "whether there is a substantial relation between the State's interest and the disclosure scheme *as a whole, not a single hypothetical*." Op. (Phillips, J. dissenting) at 2 (internal quotation marks omitted). But that cannot be correct. Such an approach eliminates the possibility of *as-applied* review. Courts can, and often do, recognize the overall propriety of a statutory scheme while still invalidating its application in a specific case. *See, e.g.*, *MCFL*, 479 U.S. 238 (statutory expenditure restriction is unconstitutional as applied to specific organization); *Sampson*, 625 F.3d 1247 (disclosure requirement is unconstitutional as applied to specific organization).

31

The dissent further errs in suggesting that if a statutory imposition can withstand constitutional scrutiny when the statute admits of no exceptions, the same imposition is necessarily also constitutionally sound even when the statute recognizes exemptions.  The suggestion fails to consider that the presence of the exemptions can cast doubt on the validity and extent of the asserted governmental interest, because the exemptions may indicate that the statutory command is not based on the asserted interest but on a qualified, more narrow interest.  That was the case in *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173 (1999), in which the Supreme Court struck down a federal ban on broadcasting advertisements for legal casino gaming in Louisiana despite two substantial and legitimate governmental interests asserted in support of the ban, because the exemptions for advertising other forms of legal gaming undermined the contention that the asserted interests accurately reflected the grounds for the ban.  *See id.* at 184–87 (stating that the asserted interests are legitimate and substantial); *id.* at 187 ("[W]e cannot ignore Congress' unwillingness to adopt a single national policy that consistently endorses either interest asserted by the Solicitor General."); *id.* at 190 ("[T]he operation of [the federal statute] and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it."); *id.* at 195 ("[T]he regulation distinguishes among the indistinct, permitting a variety of speech that poses the same risks the Government purports to fear, while banning messages unlikely to cause any harm at all."); *id.* at 195–96 ("Had the Federal Government adopted a more coherent policy, or accommodated the rights of speakers in

32

States that have legalized the underlying conduct, this might be a different case.  But under current federal law, as applied to petitioners and the messages that they wish to convey, the broadcast prohibition in [federal law] violates the First Amendment." (citation omitted)).  In the case before us, Colorado's law, by adopting media exemptions, expresses an interest not in disclosures relating to *all* electioneering communications and independent expenditures, but only in disclosures by persons unlike the exempted media.

Finally, we cannot justify shirking our constitutional duty because of the dissent's concerns about determining who qualifies for the media exemptions.  To be sure, there could be challenging questions about what entities are entitled to the same relief as Citizens United.  But those challenges are inherent in the exemptions expressed in Colorado law.  Already the Secretary of State has had to grapple with whether various media are included in the exemptions and has decided that online newspapers and blogs are "printed," Colo. Const. art. XXVII, § 2(8)(b)(I); apparently grants broadcast facilities the same exemption as print media receive for "articles"; and recognizes the difficulty of determining when a publication (hard copy or electronic) is a periodical, *see, e.g.*, Oral Arg. 18:14–19:17.[9]

---

[9]     JUDGE:  And what determines whether a publication is a magazine or a newspaper?  Could Citizens United just label a flyer "Citizens United Gazette" and—and avoid the disclosure requirements?
        ATTORNEY FOR SECRETARY:  It—I want to say I know it when I see it, but, you know, that doesn't—that doesn't have the greatest history.  The—
        JUDGE:  There are no regulations regarding how that's determined; is that correct?
                                                            Continued . . .

The above analysis does not apply, however, with respect to advertisements for *Rocky Mountain Heist* that mention a candidate or express support or opposition to election of a candidate. Citizens United has not shown that such advertisements come within the Colorado exemption for exempted media,[10] and thus has not shown that it is being treated differently from those media in this respect. Because the only relief sought by Citizens United in this case is that it benefit from the same exemptions as the exempted media, we can grant it no relief from any disclosure requirements applied to its advertising.[11]

---

ATTORNEY FOR SECRETARY: Maybe that's the best answer. Yes. I mean, I can tell you—I can certainly tell you what is and wouldn't be. Clearly *The New York Times* is a newspaper or periodical. Clearly a glossy mailer that appears in my mail box or is taped to my door that is one page and is focused solely on a candidate for office is not. Is there—is there a lot of middle ground there? Yes. But I think the best line to draw is—is it—well, let me just leave it there.

[10] Perhaps the rationale for the media exemption would also apply to a media entity's own advertisements—for example, a newspaper's advertisement promoting its article unambiguously referencing a candidate—because the audience will similarly have enough information to evaluate who is speaking. We do not reach this issue because Citizens United's complaint focuses on the differential treatment of media entities. If an exempted media entity is subject to disclosure requirements for advertisements that it places in other media, then Citizens United may also be subject to those requirements for advertisements of *Rocky Mountain Heist*. Of course, if the Secretary determines on reconsideration that a media entity need not disclose spending on its own advertisements that unambiguously reference a candidate or expressly support or oppose a candidate, then this requirement cannot be imposed on Citizens United.

[11] We are puzzled by the dissent's contention that we are deciding this case on equal-protection grounds rather than under the First Amendment. Citizens United has repeatedly disclaimed any reliance on the Equal Protection Clause and our analysis follows settled First Amendment law. Yes, we compare the treatment of Citizens United to the treatment of the exempted media. But that is solely to determine whether Colorado

Continued . . .

## C.    Remaining Preliminary-Injunction Factors

Having determined that Citizens United's First Amendment argument is valid, the remaining preliminary-injunction factors present little difficulty. *See Hobby Lobby*, 723 F.3d at 1145 (plurality opinion) ("[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." (internal quotation marks omitted)). First, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (internal quotation marks omitted). Citizens United is poised to distribute its film and would suffer irreparable injury if it were forced to comply with disclosure provisions that are unconstitutional as applied to it. Second, "when a law . . . is likely unconstitutional, the interests of those the government represents, such as voters[,] do not outweigh a plaintiff's interest in having its constitutional rights protected." *Id.* (brackets and internal quotation marks omitted). Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation marks omitted). In sum, all preliminary-injunction factors weigh heavily in favor of Citizens United.[12]  And because the district

---

has provided a sufficiently important governmental interest to justify requiring disclosures by Citizens United. We examine the reason provided by the Secretary for Colorado's decision that there is no sufficient governmental interest in disclosures by the exempted media, determine that the reason applies equally to Citizen United's films, and conclude that Colorado has not identified a sufficiently important interest to justify requiring disclosure by Citizens United.

[12] The district court held that Citizens United's showing on the four preliminary-injunction factors was required to meet a heightened standard applicable to certain

Continued . . .

court's denial of a preliminary injunction rested on what we hold to be an error of law, we must reverse the denial.  *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (in First Amendment case it was unnecessary to remand to district court to reweigh the preliminary-injunction factors).

By forbidding enforcement of portions of Colorado law against Citizens United at this stage of the litigation, we are no more rewriting Colorado law than a court does whenever it holds a statutory provision unconstitutional as applied.  To provide only two examples, in *MCFL*, 479 U.S. 238, the Supreme Court held that a provision of federal election law could not apply to a specific party, and in *Sampson*, 625 F.3d 1247, we held that Colorado disclosure requirements could not be imposed on a neighborhood organization opposing annexation to an adjacent town.

## IV.    CONCLUSION

We REVERSE the district court's denial of a preliminary injunction and REMAND with instructions to issue a preliminary injunction consistent with this opinion.

disfavored injunctions.  "Three types of preliminary injunctions are specifically disfavored:  (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012).  The district court ruled that this case implicated the first and third categories.  For these disfavored preliminary injunctions, "the movant has a heightened burden of showing that the traditional four factors weigh heavily and compellingly in its favor before obtaining a preliminary injunction." *Id.* (internal quotation marks omitted).  We need not decide whether a heightened standard applies here, however, because all four of the preliminary-injunction factors weigh compellingly in Citizens United's favor.

No. 14-1387, *Citizens United v. Gessler et al.*

**PHILLIPS**, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority that Citizens United must comply with Colorado's campaign disclosure requirements for advertisements relating to its new film, *Rocky Mountain Heist*. *See* Maj. Op. at 32–33. I respectfully dissent from the majority's reversal of the district court's decision requiring that Citizens United comply with all other disclosure requirements. I disagree with the majority's conclusion that the disclosure requirements violate Citizens United's First Amendment rights, and that this Court has authority under the First Amendment to rewrite additional exemptions into Colorado's Constitution and statutes.

I agree with the majority that we use exacting scrutiny to evaluate campaign disclosure requirements. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366–67 (2010); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976). To satisfy this level of review, disclosure requirements must have a "relevant correlation" or a "substantial relation" to a sufficiently important governmental interest. *Buckley*, 424 U.S. at 64; *Citizens United*, 558 U.S. at 366–67. Here, one important government interest is the need to "ensur[e] that Colorado's electors are able to discern who is attempting to influence their votes." Maj. Op. at 19. This important interest, tied to "help[ing] citizens make informed choices in the political marketplace," is sufficient to uphold disclosure requirements against First Amendment challenges, even those disclosure requirements that include media

exemptions. *Citizens United*, 558 U.S. at 367, 369; *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1011–12 (9th Cir. 2010).

Despite this preliminary common ground, the majority's and my paths then diverge. Unlike the majority, I approve of the district court's view of what is required to sustain exacting scrutiny here. Rather than focusing on Citizens United and its required disclosure, the district court considered "whether there is a substantial relation between the State's interest and the disclosure scheme *as a whole, not a single hypothetical.*" *Citizens United v. Gessler et al.*, -- F. Supp. 3d --, 2014 WL 4698480 at *7 (D. Colo. Sept. 22, 2014) (emphasis added). I agree with that approach.[1]

---

[1] The majority contends that I have eliminated the possibility of an as-applied challenge by my agreeing with the district court that the proper focus should be on "whether there is a substantial relation between the State's interest and the disclosure scheme *as a whole, not a single hypothetical.*" Maj. Op. at 31. This contention misunderstands my position. I say that Citizens United hasn't made a traditional as-applied challenge because it admits that the disclosure law would be valid against it if the law also applied against the exempted traditional media. By then arguing that the disclosure law becomes unconstitutional by treating traditional media differently, Citizens United, in my view, veers to an equal protection challenge, not an as-applied challenge under the First Amendment. *See United States v. Huet*, 665 F.3d 588, 600–01 (3d Cir. 2012) (stating that "an as-applied challenge does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."). *See also Fed. Elec. Comm'n v. MCFL*, 479 U.S. 238, 250-51, 263 (1986) (finding federal disclosure statute unconstitutional as applied to plaintiff's particular conduct rather than unconstitutional because it applied to plaintiff's conduct *and not* to entities covered by statute's press exemption) (emphasis added).

In response to my position, the majority relies on *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999). This reliance is misplaced. In that case, the Supreme Court reviewed the constitutionality of a statute barring speech (commercial advertisements) by some casinos while permitting others to make such speech. *Id.* at 176. *Greater New Orleans* was a speech case, not a disclosure case. Because of that, the Court

2

In contrast, the majority adopts Citizens United's position on exacting scrutiny and considers whether requiring Citizens United to disclose becomes unlawful if traditional media need not disclose. After hearing that position, the district court remarked that "[i]t sounds like you're making an equal protection argument, and yet you keep telling us, no, we're not." Dist. Ct. Trans. 19:9–11. The district court's comment arose from the bases upon which Citizens United attacked the disclosure law: "We are here because [Citizens United does] not want to have obligations imposed upon them that are not imposed upon other speakers." Dist. Ct. Trans. at 7:21–23. Citizens United further complained that "the burden [of disclosure] . . . however slight, does not, the magnitude of the burden is not as important as the fact that the burden is imposed unequally." Dist. Ct. Trans. at 19:5–8. And before us, Citizens United again complained about the "uneven disclosure" of the requirements: "there's no question that the obligation to keep records, to make disclosures is a burden and it's unequally distributed and that makes this statute—this statutory regime facially unconstitutional."[2] Oral Arg. Oct. 7, 2014. Despite its argument, Citizens United admitted that Colorado could require it to disclose if there were no exemptions at all.

---

required the government to show that the prohibition was narrowly tailored to a substantial government interest. *Id.* at 185–88. That standard is more stringent than the exacting scrutiny we use to evaluate disclosure schemes. *Compare Citizens United*, 558 U.S. at 366–67 *with Greater New Orleans Broad.*, 527 U.S. at 183–88.

[2] The majority decides the case on an as-applied basis, not reaching the facial challenge. I would reject the facial challenge too. Citizens United supports that challenge by arguing that the disclosure law discriminates on a speaker's viewpoint; like the district court did, I too find no basis in Citizens United's argument.

3

The majority elects to analyze the issue under Citizens United's approach. It first determines that Colorado has no important government interest in requiring disclosure from the traditional media because Colorado exempts the traditional media from disclosure. The majority then makes a case for why Citizens United is akin to traditional media, emphasizing that it has an "extended history of producing substantial work," which provides Colorado voters "information about Citizens United that is at least as accessible to the public as donor lists reported to the Secretary." Maj. Op. at 29. From this, the majority then makes a leap: it says that because Citizens United has the attributes of traditional media, Colorado must not have an important government interest in requiring disclosure from Citizens United. Along this same line, the majority concludes that the First Amendment requires the Secretary to treat Citizens United the same as the exempted media. Finding that he has not, the majority reverses the district court and orders the Secretary to treat Citizens United the same as the exempted media. This reasoning suffers from numerous fatal flaws.

First, the majority cites no cases to support its First Amendment/Equal Protection legal theory. When the district court told Citizens United that this legal theory sounded in Equal Protection, Citizens United did not fall back upon any case decided on the same ground. Rather, Citizens United relied upon cases in which regulations discriminated against speech based on viewpoint. In response, the district court pointed out the undisputed fact that an individual or group with ideological views contrary to Citizens United would also have to satisfy the disclosure requirements. Dist. Ct. Trans. at 19, 21.

4

Second, the majority assumes that if Citizens United is sufficiently media-like by producing 25 films, then Colorado voters have no more interest in disclosure from it than they would for an exempted media entity like *The Denver Post*. Maj. Op. at 29. This misses the mark. Colorado voters may indeed desire to know the identity of the people or groups contributing to the making of Citizens United's film as opposed to the names of *The Denver Post*'s subscribers, advertisers, or lenders. Colorado voters have determined at the ballot box that the identity of Citizens United's donors who earmark financial contributions to produce or advertise a political film helps them evaluate the film's message. *See* Colo. Const. art. XXVIII, § 1; 8 Colo. Code. Reg. 1505-6:11 (requiring disclosure of donors who specifically earmark donations above $250). I do not believe this Court acts within its proper sphere by second-guessing Colorado voters about the information they need to evaluate express advocacy such as made in *Rocky Mountain Heist*.

Third, I believe that the majority errs in supposing that Citizens United is, in fact, not being treated equally with the exempted media. We must remember that "exempted media" are exempted only for certain communications made in limited forms of speech. Colorado law does not give those media entities a blanket exemption from disclosure of all electioneering communications and independent expenditures. In fact, the Secretary has said that, just as Citizens United must disclose donors who gave earmarked funds for its political film, the exempted media would have to disclose under the same

circumstances. For example, if *The Denver Post*[3] were to solicit and obtain earmarked donations to produce a political film, it too would need to disclose the donors earmarking their contributions for that film.[4] In view of this, it is no surprise that the district court found that the disclosure exemptions are based on the form of the speech, meaning that, "[f]or example, if Citizens United publishes an op-ed in a newspaper, it will not be required to disclose the funding behind the piece. Likewise, if the Denver Post produced a film expressly advocating for the reelection of Governor John Hickenlooper, it would be forced to comply with the disclosure requirements." *Citizens United v. Gessler*, 2014 WL 4698480, at *8.

Fourth, the majority undersells the importance of the State's evidence presented at the preliminary injunction hearing that "[t]raditional news organizations typically do not engage in fundraising initiatives for express advocacy pieces or solicit money from subscribers who wish to earmark their funds for a specific message." Appellee's Br. at

---

[3] The result of this example—required disclosure—would be the same whether *The Denver Post*, *The Wellington Weekly* (a small, weekly newspaper serving that town and the surrounding rural area), or any other normally-exempt entity obtained earmarked donations to produce a similar political film.

[4] At oral argument, the Secretary noted that online editions of newspapers (i.e. *The Denver Post*) and online political blogs would be exempt from disclosure. I see nothing wrong with the Secretary interpreting Colorado's own disclosure laws to determine that some blogging posts might qualify as "[a]ny news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party." Colo. Const. art. XXVIII, § 2(7)(b)(I). And it is important to remember that the Secretary would still require the exempted bloggers to disclose their donors who fund a political film like *Rocky Mountain Heist* with money earmarked for that sole purpose.

6

39; *see* Dist. Ct. Trans. at 88:6–12. This provided some of the basis for the district court's denial of the preliminary injunction. In fact, the district court addressed Citizens United's argument to the contrary, finding it "rather nonsensical" and "clearly at odds with the operation of the disclosure laws" that "without the exemptions newspapers would be obligated to disclose the names of individual subscribers, advertisers, and financial lenders." *Citizens United v. Gessler*, 2014 WL 4698480, at *7. I agree with the district court.

Fifth, I disagree with the majority's remedy once it concludes that the Colorado disclosure scheme violates the First Amendment. At that point, it should either sever the traditional media's exemption from disclosure or strike the entire disclosure scheme. *See Citizens for Resp. Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1197 (10th Cir. 2000). But in my view, the majority takes a long stride toward lawmaking when it instead takes a pen to Colorado's Constitution and statutes and writes in a nebulous third category of entities that the Court believes have a First Amendment right to the same exemption because those entities supposedly are sufficiently similar to traditional media. Here, the majority concludes that an entity that has made 24 political films nationwide qualifies, even though *Rocky Mountain Heist* is its first film to focus on Colorado politics and draw particular attention inside Colorado. Under the majority's approach, court battles loom for other "media equivalents" with less national presence or fewer films or

7

other speech in their record. Will the Court later say that someone like Michael Moore,[5] a filmmaker with a contrary ideological view but fewer films, has a sufficient "extended history" so that Colorado citizens can evaluate his message without knowing whether any donors gave earmarked money toward his film? If not, will he have to disclose donors making earmarked donations for his films while Citizens United does not? Under the majority's approach, no one can know without filing suit and then learning the answer on a case-by-case basis. I would rather trust Colorado citizens to know when they need or do not need disclosure to evaluate a speaker's message.

Finally, although the majority recounts, but does not rely upon, the Federal Election Commission's (FEC) advisory opinion to support its result, I do wish to state my disagreement with Citizens United's argument that it should. In 2010, the FEC issued an advisory opinion concluding that Citizens United's costs of producing, distributing, and marketing its films were exempt under federal disclosure laws. *Fed. Election Comm'n Advisory Op.*, No. 2010-08, 2010 WL 3184266 (June 11, 2010).[6] Importantly, the FEC granted Citizens United exempt status not under the First Amendment, but under the federal disclosure exemption provision. *See id.* at *3–4 (citing 52 U.S.C. §

---

[5] The district court used Michael Moore as the example to ask whether Colorado's disclosure requirements would apply to someone of the contrary view. *See* Dist. Ct. Trans. at 5, 15.

[6] The FEC's advisory opinion came five months after the decision in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 371 (2010), meaning that Citizens United was not included in the media exception to disclosure under federal law when the Court approved the disclaimer and disclosure requirements to Citizens United's film at issue there, *Hillary*, under the Bipartisan Campaign Reform Act of 2002.

8

30104(f)(3)(B)). The FEC has authority to render its opinion about the application of the Federal Election Campaign Act. *See* 52 U.S.C. § 30108. In my view, neither the Colorado Secretary of State nor this Court has corresponding authority over Colorado disclosure exemptions as did the FEC over federal disclosure requirements.[7] *See Citizens United v. Gessler*, No. 1:14-CV-02266, Doc No. 1-2, at 8-10 (Secretary of State's declaratory order denying Citizens United an exemption from Colorado's disclosure requirements) (citing *Colorado Common Cause v. Gessler*, -- P.3d --, 2012 WL 3755615, at *5 (Colo. Ct. App. Aug. 30, 2012) (holding that Secretary exceeded his authority when he promulgated a rule based on federal law)).

For the foregoing reasons, and remembering that it is Citizens United's burden to prove its entitlement to a preliminary injunction, *see Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001), I respectfully dissent.

---

[7] Under the plain language of Colorado's campaign disclosure laws, Citizens United is not exempted. First, as a filmmaker, it is not acting as a "newspaper, magazine, or other periodical" that is printing a "news articles, editorial endorsements, opinion or commentary writings, or a letters to the editor." *See* Colo. Const. art. XXVIII, § 2(7)(b)(I). Second, Citizens United is not a "broadcast facility." *Id.* § 2(7)(b)(II).

9